CLERKS OFFICE US DISTRICT COURT
AT HARRISONBURG, VA
FILED

March 04, 2025

LAURA A. AUSTIN, CLERK
BY: **/s/ Amy Fansler**
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | |
|---|---|
| ROBIN S., | ) |
|     Plaintiff, | ) |
| | )   Civil Action No. 5:24cv00005 |
| v. | ) |
| | )   <u>REPORT & RECOMMENDATION</u> |
| LELAND DUDEK, | ) |
| Acting Commissioner of Social Security, | )   By:   Joel C. Hoppe |
|     Defendant.[1] | )           United States Magistrate Judge |

      Plaintiff Robin S. ("Robin") asks this Court to review the Acting Commissioner of Social Security's ("Commissioner") final decision denying her claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 404–434, 1381–1383f. Compl., ECF No. 1. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record ("R."), ECF No. 8; the parties' briefs, ECF Nos. 11, 15, 16; and the applicable law, I find that the Acting Commissioner's decision is not supported by substantial evidence. Accordingly, I respectfully recommend that the presiding District Judge reverse the Commissioner's final decision and remand the case for further administrative proceedings.

I. Standard of Review

      The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it cannot "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012).

---

[1] Acting Commissioner Leland Dudek is hereby substituted as the named Defendant in this action. 42 U.S.C. §§ 405(g), 1383(c)(3); Fed. R. Civ. P. 25(d).

1

Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings and final decision. *Rogers v. Kijakazi*, 62 F.4th 872, 875 (4th Cir. 2023); *see Jade M. v. Comm'r of SSA*, No. 7:23-cv-221, 2025 WL 18620, at *2 (W.D. Va. Jan. 2, 2025) (explaining standard).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

To receive social security disability benefits under the Social Security Act, a person must prove they are "disabled." *Britt v. Saul*, 860 F. App'x 256, 257 (4th Cir. 2021). A person is "disabled" under the Act if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *accord* 20 C.F.R. §§ 404.1505(a),

416.905(a).[2] Social Security ALJs follow a five-step process to determine whether a claimant is disabled. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983). The ALJ asks, in sequence, whether the claimant:

> (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy.

*See id.*; *Barbare v. Saul*, 816 F. App'x 828, 831 (4th Cir. 2020); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof through step four. *Barbare*, 816 F. App'x at 831. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.* If an individual is found not disabled at any step, the analysis ends. *See id.*

### III. Procedural History

This is Robin's second application for disability benefits. R. 106, 122. On January 24, 2017, Robin applied for DIB alleging she had been disabled since January 20, 2017, R. 90, because of systemic lupus erythematosus ("lupus"), chronic kidney disease, fibromyalgia, carpal tunnel, disorders of the urinary tract, obesity, and depression, bipolar, and related disorders. R. 53; 92–93. In July 2019, ALJ Suzette Knight issued a written decision, R. 90–99, finding that Robin had the following severe medically determinable impairments ("MDIs"): "lupus, fibromyalgia, and other disorders of the urinary tract," R. 92–93. ALJ Knight then found that Robin had the "residual functional capacity to perform light work" with additional postural limitations and limitations to frequent handling items with left hand and five percent time off task during an eight-hour workday. R. 95–97. ALJ Knight concluded that Robin could still do her past relevant work "as a case manager and residence counselor." R. 97–99.

---

[2] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the Commissioner's final decision.

3

\*

Robin filed her DIB and SSI claims that are on appeal to this Court in October 2020, R. 232–37, alleging that she was disabled because of lupus, arthritis, lupus nephritis, knee pain, fibromyalgia, depression, and irritable bowel syndrome. R. 106. She alleges she has been disabled since October 8, 2020,[3] her alleged onset date ("AOD"). R. 43. Virginia Disability Determination Services ("DDS"), the state agency, denied Robin's DIB and SSI claim initially in November 2021, R. 106–12, 113–19, 122–30, 131–39, and upon reconsideration in March 2022, R. 138–39. DDS found that Robin had severe physical impairments, R. 108, 125, but she had the residual functional capacity ("RFC") to perform light work and could "return[] to past work;" thus, she was not disabled, *compare* R. 112, *with* R. 129. On initial review, a DDS medical expert determined that Robin's use of foot controls with her left lower leg is "limited," but assigned no exertional limitation for handling and fingering. R. 110. On reconsideration, however, a different DDS medical expert assigned no exertional limitations for use of foot controls or handling and fingering. R. 128. On May 5, 2023, Robin appeared with counsel and testified at a hearing before ALJ Moore. R. 38–75. A vocational expert ("VE") also testified. R. 75–86. At the hearing, Robin's counsel confirmed that the record was "complete." R. 42.

ALJ Moore issued an unfavorable decision on May 30, 2023. R. 17–32. At step one, she found that Robin had not worked "since October 8, 2020, the amended [AOD]." R. 20. At step two, she found that Robin had the following severe MDIs: lupus, fibromyalgia, osteoarthritis of the knees, status/post bilateral ACL reconstructions ("bilateral knee arthritis"), chronic kidney disease, chronic pain syndrome, and bilateral carpal tunnel syndrome status/post release, and obesity. R. 20. At step three, ALJ Moore concluded that none of Robin's severe MDIs met a

---

[3] Robin initially alleged she had been disabled since January 1, 2017, R. 234, but later amended this date to October 8, 2020, R. 43.

4

Listing. R. 22–23. In particular, Robin's bilateral knee arthritis and bilateral carpal tunnel syndrome did not meet or equal listing 1.18, because "[t]he record does not establish the medical signs, symptoms, laboratory findings or degree of functional limitation required to meet or equal the criteria of [listing 1.18] and no acceptable medical source . . . has concluded that the [Robin]'s impairment(s) medically equal a listed impairment." R. 22 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.18). ALJ Moore then evaluated Robin's residual functional capacity ("RFC")[4] based on the entire record. *See* R. 24–31. She found that Robin could perform "light" work[5] with the following additional limitations:

> Stand/walk 4 hours in an 8-hour workday; occasional use of foot controls; should never climb ropes, ladders, or scaffolds; able to occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; frequent handling and fingering; and should avoid concentrated exposure to extreme cold, extreme heat, humidity, vibrations, and hazards.

R. 24; *accord* R. 29.

At step four, ALJ Moore found that Robin had the following past relevant work: (1) "case worker," generally "sedentary" exertion work, but "light" exertion work as actually performed; and (2) "special education teacher", generally, and as actually performed, "light" exertion work. R. 31. After comparing Robin's RFC to each occupation's demands, ALJ Moore found that Robin could "perform her past relevant work as a case worker as actually and generally performed." R. 31 (citing SSR 82-61 and 82-62). Accordingly, ALJ Moore concluded that Robin

---

[4] A claimant's RFC is her "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite her MDIs and related symptoms or treatment. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted).

[5] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b). "A job is also in this category when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls, which require greater exertion than in sedentary work." SSR 83-10, 1983 WL 31251, at *5 (Jan. 1, 1983).

was not disabled from October 8, 2020, through the date of the decision. R. 32. The Appeals Council declined to review that decision, R. 1–5, and this appeal followed.

## III. Discussion

Robin challenges the ALJ's RFC finding limiting her to "occasional use of foot controls" and "frequent handling and fingering." Pl.'s Br. 8. Robin argues that these limitations are not supported by a medical opinion, *id.* at 9 ("[W]hile the ALJ disagreed with the [DDS] findings as to Plaintiff's carpal tunnel syndrome and knee impairment, the ALJ relied on no medical opinion guidance to formulate the RFC . . . ."), and ALJ Moore did not order a consultative examination and thus "failed to develop the record" "after a significant change occurred in [Robin]'s impairments following" DDS's review. *Id.* at 7–8. The "most significant[]" change, Robin contends, is her carpal tunnel release surgery and "bilateral wrist pain post operative," and the ALJ did not adequately explain how the RFC determination accommodated that impairment. *Id.* at 9.

*A.    Summary*

*1.    Medical Records*

In July 2020, she attended an appointment with rheumatologist, Janaki Patel, M.D. R. 580. Robin reported joint pain but no muscle weakness. R. 583. On examination, Robin had intact range of motion of her knees and wrists, R. 583, and a "normal gait," R. 584. Dr. Patel assessed Robin with "knee pain (hx acl reconstruction)" and noted that Robin's previous x-rays show "severe" degenerative joint disease, but he concluded that she did not need surgery. R. 584. Dr. Patel made similar findings at a follow-up in March 2021. R. 586–90.

In August 2020, Robin visited her primary care provider, George Tran, M.D., for her "chronic conditions," including lupus and chronic pain syndrome. R. 465–69. Robin reported

that she was able to care for herself and that "her joint symptoms [were] under control with hydroxychloroquine." R. 467–68. Physical examination findings were normal. R. 468.

In September 2021, Robin saw rheumatologist Judy Ko, M.D., for her "joint pain." R. 591. Robin reported that she "had been doing well" and she "had moved to a less stressful job." R. 594. While Robin had joint pain, she reported "no muscle aches, no muscle weakness . . . no swelling in the extremities, no swelling in joints, [and] no [morning] stiffness" or any other symptom. *Id*. Dr. Ko found that Robin had a "normal gait and station," normal tone and motor strength, and normal movement of all extremities, but joint tenderness. R. 594–95.

At an appointment in early April 2022, Robin presented to Dr. Tran with multiple concerns. R. 776. Dr. Tran's examination findings were normal with negative Tinel and Phalen sign. R. 777. Dr. Tran assessed that Robin had bilateral hand paresthesia but no gross sensorimotor deficit. R. 777. He ordered a nerve conduction/EMG study. *Id.*

Robin went for a wellness exam in June. R. 779–83. Tanika Cushing, PA-C, found that Robin had normal tone and motor strength, normal movement of all extremities, and normal gait and station. R. 783.

In August, Robin told Dr. Tran that she had been too busy to follow-up with him and she continued to have CTS symptoms, but she was not dropping things. R. 787–88. Dr. Tran noted that the nerve conduction/EMG study from July showed left greater than right moderate median neuropathies across the wrist suggesting fair prognosis for future recovery and no cervical motor radiculopathy. R. 788.

In October 2022, Robin visited Sophia Leung, M.D., for consultation about carpal tunnel release surgery. R. 823. Robin reported that she "has had ongoing numbness in her hands for a few years," the numbness "is worse with activity such as driving and reading," she "wakes up

7

with numb hands," and she "is now losing grip strength and dropping things." R. 825. Dr. Leung found that Robin had bilateral carpal tunnel syndrome and recommended carpal tunnel release surgery R. 827, which she performed on January 27, 2023. R. 837.

In February 2023, Robin visited Elizabeth Cain, PA-C, for a follow-up regarding her carpal tunnel release surgery. R. 837. Robin denied "any residual carpal tunnel symptoms," denied "any postoperative pain," and wanted to know "when she c[ould] resume daily activities" because she "has several animals that she needs to care for." R. 837. PA Cain observed that Robin "is doing very well after her surgery." R. 839. PA Cain found that Robin was "nontender to palpation into the palm of her hands," was "able to make full composite fist bilaterally," was able to "oppose the thumb to the small fingers bilaterally," and had "virtually no pain" or "triggering of the left long finger." R. 839. At an appointment in February, Dr. Tran observed that Robin had recently undergone carpal tunnel release surgery and that she was "doing well with no paresthesia in her fingers." R. 805.

At an appointment in March 2023, Robin told Dr. Ko that she had chronic fatigue, muscle aches, and joint pain but "no muscle weakness" and "no swelling in joints." R. 688. Robin reported "some improvement" following carpal tunnel release surgery, but also "some decreased sensation in a couple of her fingers." R. 688. Dr. Ko found that Robin had normal muscle tone and motor strength, and normal movement of all extremities. R. 688.

2.   *Robin's Statements*

In a Function Report submitted in February 2021, Robin stated that her conditions limited her ability to do work because she is "not able to do the physical requirements of the field for which [she is] trained, particularly doing physical restraints." R. 292. As daily activities, Robin wakes up, lets the dogs outside, and feeds the dogs before she needs to rest. R. 293. After she

8

rests, she gets breakfast, showers (if she has the energy), reads, runs errands, and pays bills, or does paperwork, as needed. R. 293. If she has the energy, she washes dishes, does laundry, or does some cleaning. R. 293–94. Robin has no problem with personal care, but she experiences pain when getting dressed, and she uses a shower chair to bathe. R. 293. Robin took care of a pony and several dogs. *Id*. She made "easy meals" several times per week. R. 294. Robin drives and can go out alone, and she shops every couple of weeks. Robin's conditions affect her abilities to lift, squat, walk, kneel, and climb stairs, but not her abilities to bend, stand, reach, sit, or use her hands. R. 297. The farthest she could walk was 1/8 mile, and she used a walker with a seat or knee braces for longer distances. R. 298.

Robin also testified at the hearing before ALJ Moore in May 2023. R. 38–75. Robin drives and had been working parttime for several years as an office assistant at James Madison University. R. 45–46. That amount of work was "really hard" for her. R. 46. Robin explained that she was unable to work fulltime because "I have a lot of pain, I have chronic fatigue, I have days I literally don't have the physical energy to take a shower, to lift things. I certainly can't do physical restraint anymore." R. 52. Robin "had an ACL reconstruction on both knees" about "23 years" ago and still has trouble with her knees "because [she] can feel the bones slide off each other." R. 55. When this happens, Robin cannot stand. R. 55. As to her carpal tunnel syndrome, Robin "no longer ha[s] the numbness and tingling" so she is "much more aware of the pain in [her] hands." R. 59. Her "fingers still don't always work and [she] drop[s] things," or her fingers "twitch and . . . things go fly in the air . . . ." R. 59. For activities of daily living, Robin gets up "about 8:00," lets the dogs out and feeds them. R. 64. Robin cleans her house "about once a month," mows half an acre with a riding lawn mower, handles her own finances, pays her own bills with checks, washes her clothes "a little at a time," and hand washes her dishes, but has

9

trouble scrubbing and vacuuming. R. 64–65. She does all of her housework, but does it slowly and not very often. R. 69. Robin reads "a lot," cross-stitches, does crossword puzzles, and plays boardgames or card games. R. 69. Robin does not socialize "as much as [she] used to," but she "occasionally" visits her friendly neighbor, and she volunteers at the Relay for Life and at adoption events for the foster rescue. R. 71. When Robin works at the adoption events, she sits and holds the dog to introduce it to people. R. 72. When Robin volunteers at Relay for Life, she "mostly sit[s]" at the check-in table. R. 72–73. Robin uses a walking device if she is walking any distance, R. 73, but does not use it for work because she is "mostly sitting." R. 74. She can comfortably lift a book or a pitcher of water, but sometimes she cannot lift these objects. R. 73.

B.    *Analysis*

Robin argues that ALJ Moore failed to develop the record regarding her RFC limitations of "occasional use of foot controls" and "frequent handling and fingering" and failed to "explain how she arrived at this RFC conclusion after a significant change occurred in Plaintiff's medical condition following the review of the state agency medical consultants." Pl.'s Br. 7–8. I agree that the ALJ's RFC explanation was inadequate.

A claimant's RFC is his or her "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite his or her medical impairments and related symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). It is the ALJ's duty to determine a claimant's RFC. *See* 20 C.F.R. §§ 404.1546(c) ("the administrative law judge or the administrative appeals judge . . . is responsible for assessing your [RFC]"), 416.946(c) (same); *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011) (an RFC "is an administrative assessment made by the Commissioner based on all the relevant evidence in the case record. . . ."). An ALJ assesses a claimant's RFC based

10

on all relevant medical and other evidence. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(1). The Commissioner "has specified the manner in which an ALJ should assess a claimant's RFC." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). First, because RFC is by definition "a function-by-function assessment based upon all of the relevant evidence of [the claimant's] ability to do work related activities," SSR 96-8p, 1996 WL 374184, at *3, the ALJ must identify each impairment-related functional restriction that is supported by the record, *see Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016). *See* SSR 96-8p, 1996 WL 374184, at *1, *5 (explaining that an ALJ determining the claimant's exertional RFC must identify the claimant's impairment-related "functional limitations or restrictions" and evaluate his or her "work-related abilities on a function-by-function basis," e.g., sitting, standing/walking, lifting/carrying, before the ALJ can express the RFC "in terms of the exertional levels of work, [i.e.,] sedentary, light, medium, heavy, and very heavy"). The RFC should reflect credibly established "restrictions caused by medical impairments and their related symptoms" that impact the claimant's "capacity to do work-related physical and mental activities" on a regular and continuing basis, SSR 96-8p, 1996 WL 374184, at *1–2. Second, the ALJ's decision must include a "narrative discussion describing" how specific medical facts and non-medical evidence "support[] each conclusion" in the RFC assessment, SSR 96-8p, 1996 WL 374184, at *7, and logically explaining how he or she weighed any inconsistent or contradictory evidence in arriving at those conclusions, *Thomas*, 916 F.3d at 311. Generally, a reviewing court will affirm the ALJ's RFC findings when he or she considered all relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017), and the written decision built an "accurate and logical bridge from that evidence to his [or her] conclusion[s]," *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018). *See Thomas*, 916 F.3d at 311–12. ALJ Moore's explanation failed to

11

meet this deferential standard.

ALJ Moore's RFC limited Robin to occasional use of foot controls because of her bilateral knee arthritis and frequent handling and fingering because of her carpal tunnel release surgery. *Id.* (citing R. 590, 837). In arriving at these conclusions, ALJ Moore adequately catalogued Robin's statements about her symptoms and limitations, R. 25, 29, and the medical records detailing her bilateral knee arthritis, *see, e.g.*, R. 25–30 (citing R. 465–69, 495–500, 580–95, 684–689, 779–83, 801–12), and carpal tunnel syndrome, *see, e.g.*, R. 27–28 (citing R. 641–660, 784–800, 825–39). However, the ALJ's analysis of that evidence and her explanation of how she assessed limitations based on that evidence is lacking.

For her analysis and explanation, the ALJ noted Robin's testimony that her impairments, including knee pain and carpal tunnel syndrome, rendered her unable to work on a full-time basis, but determined that the testimony was inconsistent with the record. R. 29. The ALJ noted that the medical evidence did not show that Robin used an assistive device to walk or that one was medically necessary. *Id.* Additionally, Robin could do activities of daily living independently. *Id.* Robin's treatment consisted of taking prescribed medications, and she had undergone bilateral carpal tunnel release surgery, but she had no additional surgical interventions. *Id.* The ALJ also assessed the medical opinions of the DDS experts. The ALJ noted that the expert on initial review limited Robin to "no more than frequent pushing and/or pulling with the lower extremities," R. 30 (citing R. 110 ("Operation of foot controls with left lower extremity is limited due to bone on bone arthritis to knee with pain complaints, not more than frequent.")), but the expert on reconsideration did not include any limitation, *id.* Neither expert identified a limitation in handling and fingering. The ALJ found these opinions "generally persuasive," but determined the medical evidence supported additional limitations. *Id.* The ALJ

concluded, Robin's "knee pain with a history of ACL reconstruction supports a limitation to occasional use of foot controls." *Id.* The claimant's bilateral carpal tunnel release surgery in January 2023 supports a limitation to frequent handling and fingering." *Id.*; *see also* R. 29 ("the undersigned has limited the claimant to …occasional use of foot controls … frequent handling and fingering … due to her … osteoarthritis of the knees status/post bilateral ACL reconstructions … bilateral carpal tunnel syndrome status/post release").

The ALJ related the limitations to an impairment, but she did not explain why the evidence supported the limitations at issue. She simply concluded that it did. The ALJ did not explain that she relied on a medical opinion to support the RFC limitations, *see Sizemore v. Berryhill*, 878 F.3d 72, 80–81 (4th Cir. 2017) (ALJ properly relied on medical opinions to support RFC finding), nor did she identify particular medical evidence or Robin's activities of daily living to explain how the limitations fit the evidence. That lack of explanation requires the Court to guess at how the ALJ determined that the particular limitations properly accounted for Robin's functional abilities. When the court is "'left to guess' as to how the ALJ reached her evaluation" of the evidence, then it cannot "review the reasonableness of her conclusions," *Testamark v. Berryhill*, 736 F. App'x 395, 398 (4th Cir. 2018) (per curiam) (quoting *Mascio v. Colvin*, 780 F.3d 632, 640 (4th Cir. 2015)), to ensure that "the ALJ's decision is supported as a matter of fact and law," *Keene v. Berryhill*, 732 F. App'x 174, 177 (4th Cir. 2018) (per curiam). "Put simply, the ALJ's lack of explanation requires remand." *Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 663 (4th Cir. 2017).

\*

For the foregoing reasons, I respectfully recommend that the presiding District Judge **REVERSE** the Commissioner's final decision, **REMAND** the case for additional administrative

proceedings, and **DISMISS** the case from the Court's active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to counsel of record.

ENTER: March 4, 2025

*/s/ Joel C. Hoppe/*

Joel C. Hoppe
United States Magistrate Judge